City of Fort Worth, Texas City of Fort Worth, Texas City of Fort Worth, Texas City of Fort Worth, Texas City of Fort Worth, Texas City of Fort Worth, Texas City of Fort Worth, Texas City of Fort Worth, Texas City of Fort Worth, Texas City of Fort Worth, Texas Due to the circumstances of Pelley's actions, especially at the car wash and his dangerous driving into oncoming traffic, Tidwell made two radio announcements intended for fellow officers in pursuit. One was a notice to the officers that he had a dog. Those weren't his exact words, but that was his intention, probably, of what it relayed. And Pelley interprets this as a notice that Tidwell intends to use the dog regardless of the outcome of the pursuit. The other announcement that Pelley had, first driven out of the car wash, after he had first driven out of the car wash and nearly hitting the car, regarded that he had not had contact with Pelley's vehicle. It was a close call, but make no contact. Once again, this is interpreted as a statement that he intended to use the dog. Tidwell believes he said he made no contact, but the court opinion finds that this distinction and dispute between the parties is a material issue of fact as to Tidwell's intent to put the dog on a Pelley. Subjective intent is not relevant to the issue of qualified immunity. In Graham v. Connor, the court held an officer's evil intention will not make a Fourth Amendment violation out of an objectively reasonable use of force. This court has held that a particular defendant's subjective state of mind has no bearing on whether a defendant is entitled to qualified immunity. Thompson v. Upshur, Fed Third, 447. In Poole v. Shreveport, 691, Fed Third, 624, this court found to make out a Fourth Amendment violation, let alone one that violates clearly established law, the question is whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting them without regard to the underlying intent or motivation. Again, in Graham, the court states we must evaluate an officer's use of force from the perspective of a reasonable officer on the scene  Any evil intentions motivating an officer's objectively reasonable use of force will not make a Fourth Amendment violation. In other words, the intent of the officer is not material to this question. As to the actions taken by Tidwell to arrest the appellee in releasing the dog from the vehicle near the end of the dead-end road which had led to the stop of the appellee near a wooded area surrounding a golf course, he could reasonably have believed that appellee had exited his vehicle or was planning to exit the vehicle and run on foot into the area at the end of the road. This is especially so since appellee had appeared ready to do just that at the car wash, but the appellee claimed he was unable to unlock his door, only to drive headlong into oncoming traffic. The dog would have been a reasonable help in apprehending appellee on foot. Once Tidwell knew that appellee had remained in the vehicle as he walked toward the woods, he stopped away from the door and he ordered the appellee to show his hands. Then, according to appellee, appellee said, It's not my car. I don't know how to unlock it. However, and this is a big however, he did not turn the engine of the pickup off and it was still running. Malone then said he was going to unlock the door and started dropping his hands inside the vehicle. Because Tidwell could not know appellee's true intentions, he immediately ran to the side of the vehicle and struck at appellee with a flashlight attached to his gun. A struggle ensued and several other officers joined Tidwell at the side of the pickup in trying to subdue Malone, who continued to disregard orders to shut off the engine and give up his hands. The confrontation is fully described in the briefs and in particular the brief of Officer Stroud and Lehman describes in detail action that occurred at the pickup through the subduing of appellee beginning at page 13, paragraph 6 through page 19. You've exceeded your time. I'm sorry, Your Honor. Scalendo representing Mr. Davis. May it please the Court. My name is Luis Scalendo. I represent Officers Davis, Spills, and Gibson. District Court erred in denying Officers Davis, Spills, and Gibson's motion for summary judgment based on qualified immunity because the plaintiff, Malone, failed to raise any material fact issues that these officers' actions violated any clearly established constitutional right of Malone's and their actions were at all times objectively reasonable. Scalendo, do you take issue with the video? No, Your Honor. I think the video depicts as clear as it can, can depict the activities of the pursuit and then what happened after the pursuit. We do not dispute the genuineness of the video. Well, I viewed the video, and it appears to show where Mr. Davis was at various times during this incident. Is that accurately displayed? Yes, Your Honor, it does. And let me just address that issue, Your Honor, because it is undisputed that Malone led these police officers in this reckless, dangerous pursuit at night. They followed him into a car wash, and rather than stopping his plane and giving up at that point, he sped up, raced out of the car wash, nearly hit Officer Tittle's car, and rushed headlong into oncoming traffic. This is at night in a very busy street in Fort Worth, Texas. Officer Tittle was the only officer that was able to then pursue Mr. Malone into a dead-end drive. That's why he was the first officer that arrives there. Shortly thereafter, Officer Davis, the officer that you're referring to, Your Honor, arrives, and you can see him as he exits his patrol vehicle. And as he exits his patrol vehicle, what does he do? He stops and he looks and he assesses the situation. He's not certain what's going on at this point. Then what does he do? He draws his gun, and then he carefully, undercover, he says, approaches where Officer Tittle is standing, already in a struggle with Malone to try to get him under control and bring him into custody. That is what he sees. Shortly thereafter, what happens? Officer Fields then arrives, and Officer Gibson then arrives. When these officers arrive on the scene, they were not present during the initial confrontation that Mr. Tittle's attorney referred to between Malone and Officer Tittle. What they saw was Officer Tittle struggling with Malone to bring him into custody. What they heard was that the motor on that truck was still running. What they also heard was the motor was being accelerated. They heard Officer Tittle commanding Mr. Malone to turn off the truck and to exit the truck, and he refused to do so. These officers are trained that they must give deference to the canine officer. He is the officer in charge of the scene. The canine, the service canine, the police dog, will only obey the handler's commands that are given in German. At this point... Who was the ranking officer involved in this? Who was the top-ranked officer? At the scene, Your Honor, what happens, and again, that's just police orders. We don't really formulate the basis or material as far as formulating the basis for whether or not these acts are constitutional or not. But to answer your question, Your Honor, the canine officer on the scene with the canine is responsible, and he's given deference by the officer. He is the officer in charge of the scene at that point. That's what they're trained. A canine officer is automatically in charge. When they have engaged a canine on a suspect, the other officers are trained to step back and let them finish taking the suspect into custody. That's what they're trained. Yes, Your Honor. This court, in Dominguez v. Knowlton, recognized that officers are not required to give a defiant, dangerous suspect like Malone every possible deference and to have read his mind. They were not required to allow him to take off again before they were able to use force. In Tannerick and Suffolk County Sheriff's Office, which is cited in our brief, the courts have said that the courts who pass upon bystander liability must take into account the information imbalance between the officers that are already on the scene, as Officer Tudor was, engaged with Malone, and the officers that arrive afterwards, and that it is reasonable for those officers arriving afterwards to presume that that officer knows what he's doing, that he's acting reasonably in taking the actions he's taking to bring that suspect into custody. And Mr. Davis was the second one to arrive. Yes, he was, Your Honor. First after Tidwell. Yes, Your Honor. Ballot against Hedwig Village Police Department, this court affirmed the decision which set precedent in the circuit in 2009. In that case, the court said that these officers could not be held liable, could not be held liable because they did not intervene, because they did not have control of the canine. Your Honor, for those reasons, we believe that the court should reverse the district court and hold that these officers are entitled to qualified immunity. Thank you, sir. Mr. East. May it please the Court, my name is Ken East, and I represent Officers Stroud and Layman, the last two officers to arrive on the scene who are still left in this case. To jump to Judge Dennis' question about the video, on pages 28 and 29, or to address the earlier question, on pages 28 and 29 of my brief, Your Honor, there is a second-by-second recount of the relevant portion of the video that applies to my officers. I think all officers here today are entitled to qualified immunity. I think the case is especially easy with respect to my officers who arrived so late into the scene that they didn't see the initial interaction, they didn't see the initial strikes that are complained about. They had no idea what had occurred up until that time. On pages 28 and 29, there is a second-by-second breakdown that not only is what I think the video shows, it's what Mr. Malone thinks the video shows. I went through it in the deposition with him, and he acknowledged everything in that breakdown. Mr. Malone resisted coming out of the vehicle. He claims he didn't want to hurt the dog. He got on the ground. This is not the entire video. This is just a certain portion of it. Well, that's the portion that I think is especially relevant as to the claim against my clients that they should have intervened against a police dog when a canine officer was going through an arrest process that occurred in seconds-long intervals of time. He was on the ground. He admits he refused commands. He explains, well, I thought I was trying. For eight years in this litigation, I swore that I complied. But now that I see it on video, I know that I didn't comply. Well, his subjective reasons are immaterial to what reasonable officers on the scene were viewing. They viewed an engine being revved, resistance coming out, refusal to comply with commands on the ground. Then my officers see the canine, and we see an officer go down, get his handcuffs out, roll him over, handcuff him, pull out the leash, put the leash on the dog, pull the dog off the suspect. There's nothing in what any reasonable officer could have seen there that would have led him to know or believe that the canine was being used improperly. And with respect to another exchange you had with Mr. Galindo, Your Honor, on page 2499 of the appellate record is testimony elicited by the plaintiffs from a Fort Worth training officer, in which he states, if they were to choose to intervene while the dog is still engaged, there's a higher potential for injury to both the officers and the suspect. If the officers don't intervene and distract the dog, then the canine officer can finish his job faster. Once the canine officer releases the dog, he's in control of the entire situation. Patrol officers have been trained to stay out of the engagement until the dog's been controlled again. Now, I could envision some extreme circumstance where the canine officer has walked away from the scene, but that's not what happened here. There was nothing that this officer did with that dog that these bystander officers could have viewed as being so outside of the box that they were supposed to violate their training. You're speaking for all the bystander officers? I think with respect certainly to the dog. My officers weren't there with respect to the earlier engagement, but certainly with respect to the dog, I don't think any reasonable officer in the universe could have viewed that and thought that Officer Tidwell was out of control with his use of the dog. And there's ample case law that says a canine officer is okay in leaving the dog on the bite through the handcuffing process. Was the dog on the leash when your two officers arrived? No, Your Honor, he was not on a leash. At which point did they arrive? With respect to where Malone and Tidwell and the dog were. Roughly the 45-second mark, and that raises an interesting point with respect to my officers. The district court correctly in its factual recitation states that they arrived about 45 seconds into it, well after the initial interchange and the strikes were delivered. In the district court's analysis, he lumps my clients in with everybody else and says they were among the first officers to arrive within 30 seconds. That's just the factual mistake the district court made. My clients didn't arrive until nearly 45 seconds into it, long after the exchange had occurred. Again, I think all officers acted reasonably, and if Officer Tidwell is entitled to immunity, certainly my clients are for that reason as well. But with respect to my clients, I think it's an especially easy case. That's all I had. I thought you had another question, but thank you very much. Have you ever answered my question where Malone and Tidwell and the dog were when your clients could see what was going on? Yes, Your Honor. When my clients arrived, Officer Tidwell was at the door of the vehicle, hands-on with the suspect. Officer Lehman, my client, goes to the passenger side of the truck where he remained until the suspect came out of the truck. Officer Stroud was on the driver's side but back away looking for other threats, other suspects. He pulled his baton out one time, set it down, turned around. Other officers were already engaged, and he just viewed for a few seconds that happened. Then the suspect came out of the truck, and they all viewed what happened on the ground with the dog at that point. I hope that answered it. Thank you. Yes, ma'am. May it please the Court. Sarah Romine on behalf of the appellee, Michael Malone. The appellant's arguments in this case depend upon a construction of the facts that this Court simply cannot accept. For example, in their briefs,    depend on a construction of the facts that this Court simply cannot accept. At various points, the appellants ask this Court to assume that Malone struggled with Officer Tidwell, that Malone was instructed to turn off the engine, and that Malone resisted coming out of the vehicle. These are all disputed facts that the Court cannot accept for purposes of its review. In order to reverse the judgment of the District Court or the denial of summary judgment below, the Court would have to disregard the applicable standard of review, construe the facts in the light most favorable to the appellants, and draw inferences in favor of the appellants. In short, this Court would have to reach a dispute over which it simply does not have jurisdiction. I'm going to address the jurisdiction issue first because I think it illustrates the fundamental error in the arguments advanced by the appellants, and then we'll attempt to split the remainder of my time between the excessive force claim against Officer Tidwell and the bystander claims against Officers Stroud, Davis, Fields, Gibson, and Lehman. As this Court explained in its Ramirez and Hale decisions, appellate review in an interlocutory appeal of the denial of summary judgment on the basis of qualified immunity is limited to whether the District Court erred as a matter of law in assessing the materiality of the facts in dispute. This Court has no jurisdiction to review the genuineness of a particular fact dispute and must adopt the District Court's articulation of genuinely disputed facts and limit its review to the legal sufficiency of what the District Court found to be supported by the record. If disputed issues of fact material to the qualified immunity inquiry exist, the District Court's denial of qualified immunity is not immediately appealable, and this Court must dismiss the appeal for want of jurisdiction. Although the appellants didn't mention it in their argument explicitly, they assert at various points that Scott v. Harris, a United States Supreme Court decision, somehow alters the standard of review. However, the existence of videotaped evidence only alters the standard of review if the video blatantly contradicts the nonmoving party's recitation of the events. The District Court here properly concluded that the video does not contradict Mr. Malone's version of events and, in fact, substantially undermines the appellant's entitlement to qualified immunity. The District Court carefully considered the video and found that genuine issues of material fact still exist as to the reasonableness of the officer's conduct. In fact, in reviewing the summary judgment evidence, the District Court found that the record established that after Michael Malone had surrendered and was sitting unarmed and helpless with his hands up, surrounded by Fort Worth police officers, Officer Adrian Tidwell repeatedly struck Malone in the face,  and delivered knee strikes to Malone's ribs and subjected Malone to a sustained canine attack, all of which left Malone with permanent nerve damage and neuropathy to his arm, a torn rotator cuff, and a broken tooth. In fact, the District Court found that at several points, Tidwell lifted the canine up to the truck window to allow the canine to viciously bite Malone and continued to instruct the canine to bite Malone after he was handcuffed. Based upon these facts, the District Court concluded that genuine issues of material fact exist regarding that officer's entitlement to qualified immunity. Because the facts are so important to this court's review and what the District Court found substantiated by the record is so important, I'm going to briefly summarize some of the relevant facts when taken in the light most favorable to Malone, because I think it dictates the conclusion that this court has to dismiss for lack of jurisdiction. As the District Court correctly noted, at the time of the arrest, Malone had pulled the truck into a dead end, parked, and placed his hands out the window of the truck. Officer Tidwell pulled in directly behind Malone, with Officer Davis close to Tidwell and Officer Fields pulling up alongside the passenger side of the truck, effectively blocking Malone in and eliminating any risk that Malone fled again by use of the truck. In the words of Officer Davis, there was, quote, nowhere to go. As I believe Appellant's counsel indicated, there were trees and a fence and a guardrail and a 20-foot drop-off immediately to the front of Malone. And as Tidwell explained to Internal Affairs, when he got out of the car, quote, at that time we thought the pursuit had ended, terminated, as far as driving goes. Without waiting for other officers to arrive and without following Fort Worth Police Department policies, Tidwell immediately deployed the canine and approached the truck. When Tidwell approached Malone, Malone had his hands up and out the truck window in full surrender. This finding was actually notably corroborated by the Internal Affairs report, and Officer Fields, during his interview and deposition, stated that when he pulled up, he saw that Malone had his hands up. We agree that upon approaching the truck, Tidwell instructed Malone to exit the car. Critically, at this point, Tidwell was aware that Malone could not exit the vehicle through the door. That's a finding that the district court found corroborated through multiple avenues of Tidwell's own testimony, in which he indicated that he observed at the car wash that Malone was unable to exit the vehicle, knowing that Malone could not do what he was instructed to do. In response, Tidwell proceeded to wind up and strike Malone in the face with the loaded pistol, not the flashlight, as the district court found, but rather the butt of a loaded weapon. Fort Worth police officers are trained specifically not to engage in this course of conduct. And meanwhile, the dog, which is off-leash, is continuing to lurch at Malone in the truck window. When Tidwell struck Malone, importantly, Officer Davis was approaching with Officer Fields on the passenger side. During this time, Tidwell again struck Malone in the face, and the dog continued to actively lunge at Malone with Officers Fields, Davis, and Gibson surrounding the truck. At this time, Tidwell again lifted the dog up to allow the dog to bite Malone through the truck window. Nonetheless, despite the fact that Tidwell and the dog are lunging at him, Malone attempts to comply with Tidwell's instruction to exit the vehicle by announcing his intent to go through the window. As he did so, as Malone was attempting to exit through the window, Tidwell lifted the dog up to again allow the dog to bite a helpless Malone. Officers Stroud, Davis, Gibson, Fields, and Lehman witnessed the canine attacking Malone and surrounded the truck as Tidwell pulled Malone down onto the ground. These officers then formed a semicircle around Tidwell, Malone, and the dog while the dog was allowed to attack Malone unrestrained. In fact, even after Malone was handcuffed and in police custody, with several officers surrounding Malone, Tidwell, and the dog, Tidwell continued to instruct the dog to bite Malone, including by pulling on the leash. And the testimony is undisputed that pulling on the leash instructs the dog to bite harder. It is also undisputed that during the pursuit, Tidwell signaled to the other officers, I got a dog so y'all can just chill out. I got a dog with ya. And he just tried to ram K-977, so make no contact. And those words are important because on summary judgment, this court has to assume that the statement that was made was to make no contact. Tidwell testified that his intent in uttering these words was to signal to the other officers that he was going to release the dog at the end of the chase. The district court properly found that this created a fact issue about whether Tidwell made the decision to deploy the dog before the chase concluded, regardless of how the chase ended. Based on this, the district court properly determined that genuine issues of material fact exist regarding whether or not Officer Tidwell used excessive force against Malone. Although the officers make much of the fact that Tidwell engaged in a high-speed pursuit, this court's precedent establishes that the relevant inquiry is the amount of force that is used at the time in whether and the threat that is posed by the suspect at the time the force is used. Although force may be used when necessary, this court has held that police are only entitled to use measured and ascending responses to the actions of a suspect that must be calibrated to physical and verbal resistance shown by the suspect. So the relevant inquiry for this court is whether at the moment Malone's actions gave rise to such an immediate threat to justify Tidwell's use of force through the pistol whipping of the butt of the gun, the knee strikes and the fist strikes, as well as the canine attack. This court has also found that a reasonable jury could conclude that excessive force was used when an officer engaged in very little, if any, negotiation with the suspect and instead immediately resorted to the use of force. And that's the Newman v. Goodry case, which cites DeVille v. Markentile. And in Eichert v. Blair, this court had found that nearly any force may be considered excessive and unconstitutional when the suspect is in a mode of active surrender. This court's case law also establishes that Officer Tidwell's conduct in using force against a suspect that was surrendered and effectively posed no threat to the officers was objectively unreasonable in light of clearly established law. It is beyond dispute that the right to be free from excessive force during an arrest was clearly established in 2009. That's this court's Newman and DeVille opinions. And the fact that Officer Tidwell used a variety of means, including pistol whips, punches, knee strikes, and a canine attack, doesn't alter the analysis that it was clearly established in 2009 that using intermediate or hard intermediate force on a helpless surrendering suspect is unconstitutional. And the case law also establishes that this particular type of force, including the use of the dog, is unconstitutional, and that was clearly established. The district court relied on the Calton opinion, which is a decision from Judge Godbey out of the Northern District, in which he held that the use of a canine on a surrendering suspect was excessive. There's also an additional case out of the 11th Circuit, the Priester case, in which the court there held that the use of a canine for approximately two minutes on a suspect who was not posing a threat at the time was unconstitutional, and that that was clearly established at the time. Priester is a case that the opinions that the officers like to cite is distinguished from. They rely heavily on the Ballard and Crenshaw cases, Crenshaw being an 11th Circuit case, but the Priester case is much more applicable to the fact pattern that we have here, which included a sustained canine attack. The officers also attempt to suggest that their officers, apart from Tidwell, were not present for the use of force and didn't see it. In this respect, the district court found that the videotape of the arrest was instructive because it shows the relative location of all of the parties, and as Judge Dennis asked, and I think the appellants all admitted, there is no dispute about the genuineness of the video. From our perspective, the video is accurate, albeit a little bit incomplete. There are portions of the events that aren't adequately captured by the video, but the video does accurately describe the events from the dash cam and the relative positions of the parties. For this court's reference, in our record excerpts, we provided still shots of where the officers were. It's a little bit easier than watching the video and shows the relative location of the parties. With respect to Officer Fields, however, they assert that Fields and Davis were not able to accurately witness the events. Both of those officers arrived almost immediately behind Tidwell. It is because of Officer Davis's dash cam that we were able to see the incidents, and Judge Dennis asked a question about who would be the commanding officer on the scene. Under Fort Worth Police policy, Officer Davis was the officer who initiated the pursuit and should have been the leading officer in charge of the apprehension, and so when Tidwell arrived on the scene, under Fort Worth Police Department policies and procedures, including canine procedures... Was it his rank? Was it... Did you determine this by his rank? No. Fort Worth Police Department policy provides that the officer who initiates the pursuit is the commanding officer. It is not by virtue of his rank in the sense of is he a sergeant or something like that. One of your opponents argued that once a dog is introduced and is active in the matter, that the canine officer is the one that must control the scene. Do you agree with that? What is the evidence on that? The evidence in the record that bears on this is the Fort Worth Police Department canine unit standard operating procedure. That's available at 5986 to 5992. And I think the court's review of that policy would be instructive because what should have happened, and I'll also note that the Fort Worth Police Department general orders manual is at 5993 and 6030. What should have occurred upon arriving at the scene, in part because of the nature of the high-speed chase, is that the officer should have initiated a felony stop procedure. And what that means is that they should have stayed back and given instructions to the suspect to get out of the vehicle or to take other actions to initiate his surrender. Officer Tidwell, by rushing up and not waiting for other officers to arrive, actually took action that heightened the risk to the officers and the canine. It illustrates the unreasonability of Officer Tidwell's conduct and taken in conjunction with his earlier statements indicated to the district court an intent to engage in force regardless of the outcome. But to answer your question, Judge Dennis, what should have happened is Officer Tidwell, upon arriving, should have waited for Officer Davis and Officer Fields, who were close behind him. And upon learning particularly that Officer Tidwell was in the truck, there was no longer a need for the canine. I don't have much question about what Tidwell acted improperly, but what I'm concerned about is whether or not these other officers could have done anything about it, should have done anything about it, or have an excuse not to have done anything about it. Yes, Your Honor. And I think the answer to that is the Priester case is instructive on this point. The officers assert that they could have done nothing because canines only take instructions from their handlers. The argument that's advanced here, which is distinct from the argument that was advanced by the Pro Se Appellant in Ballard, is that what the officers should have done was instructed Tidwell to call off the dog. And in Priester, the Eleventh Circuit found that there can be bystander liability when a canine is being used because the officers who were within earshot of the canine officer and were able to see what was happening had the opportunity to tell the canine officer to call off the dog. And here, the video is extremely compelling on the relative positions of the officers who are still involved in this lawsuit. They formed a semicircle and watched as a helpless suspect, who was going to be taken under arrest, was attacked by a canine. There's no question that they were both visible and had the opportunity and were in earshot of Tidwell. You're talking about after Malone was out of the car. Is that right? I am, as a general matter. The only thought of an excuse before Malone was out of the car occurs to me is maybe some of these officers were uncertain whether there was a weapon or something dangerous left in the car, still in the car, while Malone was before he was taken out. Is that true? I mean, anybody suggest that or is that an excuse for them not to have interceded before Malone was taken out of the car? On these facts, Your Honor, absolutely not. The officers who surrounded the truck were also looking into the truck. There was no weapon that was visible and Malone had his hands up. And it's important to note, I think the fact pattern does differ with respect to some of the officers. For example, Officer Fields, when he pulled up, pulled up alongside the truck, blocking Malone in, and he testified that he could see Malone's hands were up when he arrived on the scene. He also, Officer Fields also knew that Malone was unable to exit the truck because of what he had witnessed personally at the car wash. These facts demonstrate what the officers, and each of the witnesses, if you would like, but they had the ability to see not only that Malone was an active surrender, but they could see based on what was transpiring that he didn't pose any active threat to any of the officers. And, in fact, when you look at the video, many of the officers, particularly once Malone is taken out of the car, don't even have weapons drawn and are standing around with their shoulders or their hands crossed, which suggests that they don't perceive any reasonable threat from the suspect who's lying on the ground with a canine biting into it and, you know, Officer Tidwell with his gun pointed. And so the question for this court is whether or not we've introduced sufficient evidence, well the question for the district court was whether or not we introduced sufficient evidence to raise a genuine issue of material fact about whether those officers had an opportunity to see that unconstitutional or excessive force was being taken and had the opportunity to stop it. And we did. That's based on the testimony taken from these officers and their depositions, their statements to IAD and the affidavits that they submitted. Many of the officers had the opportunity to see Malone in the truck surrendering and also had the opportunity to see Tidwell lifting the canine up to allow it to bite into Malone. Certainly, there can be no question that when Malone was taken out of the truck and is laying on the ground being attacked by the dog with a semicircle of approximately ten officers surrounding him that he posed no reasonable threat. I think this court's opinions in Chacon and Ramirez v. Martinez, I believe, are instructive on this point. Certainly Ling v. Banda is a similar case in which a suspect was surrendering and there can be no, you know, under that circumstance, there's no justifiable use of force if the suspect, to be apprehended, does not pose a danger to the officers. This court's precedent establishes that any use of force where you have a helpless suspect who's attempted to surrender is excessive and particularly so when you have that number of officers in a semicircle watching a helpless victim be attacked by a canine. With respect to I want to briefly touch on Stroud and Lehman because I think those are the two officers that in their brief have suggested they arrived at the scene approximately 45 seconds into it so they didn't have the opportunity to witness Tidwell striking Malone with the butt of the gun. The district court correctly found that Officer Stroud who was present for a large portion of the canine attack and I think in this respect the still shots that are included in our record excerpts that identify the location of each of the officers. Officer Stroud is officer number 9 and Officer Lehman I believe is officer number 10. You can see that they are in close proximity to where the canine is on Malone and where Tidwell is on Malone and they are there for the bulk of the canine attack when Malone is out on the floor on the ground. Notably, Officer Stroud stated that he did understand from Tidwell that he had a dog on him, that he heard that chatter over the police radio. The district court found that that chatter created in essence a genuine issue of material fact about whether or not not only Officer Tidwell had signaled but the other officers understood that Tidwell was planning to use the dog at the culmination of the chase regardless of the outcome. When you assess the bystander liability the fact that these officers were able to hear the police comments, what was going to happen, that's a fact issue for the jury upon which the court found that jury could find that they had bystander liability. With respect to Officer Lehman, although he did go around to the passenger side of the vehicle he came around to the front of the truck while Malone was on the ground being attacked and importantly, Officer Lehman testified that normally when we tell someone to get on the ground and they do the incident is over. Which illustrates what the officers were seeing. A suspect that had been taken was lying prone on the ground. They make much of the fact that Malone didn't pull his hand out. But that's not active resistance. Instead Officer Lehman testified that he understood the command to Malone to be to lay still. There's all sorts of different evidence in the record over what commands were being given and what's construed as active resistance. However, Lehman testified that he understood that normally when a suspect is pulled to the ground, the incident is over. And there's at least a fact issue on what Malone was being told when he was laying on the ground and whether or not his actions could be construed to be active resistance. This court in the Chacon opinion found that even when a suspect pulled his hands away, that that amount of resistance certainly did not justify the use of force that was used in that case. But with respect to these particular officers and the evidence that we've put in the record that raises questions on bystander liability, I think what's important here is that many of the arguments that are advanced by the appellants depend on a construction of the facts that the court just cannot accept. The idea that as they asserted in the opening argument that Malone was resisting or actively engaged in a struggle with Tidwell is something that this court simply cannot accept. Taking the record instead in the light most favorable to Malone, I think the court has to accept that Malone had his hands out, was in active surrender, and was doing his best to comply. The instruction that they make much of is that Malone didn't comply with the instruction to get Spread Eagle on the ground. What Malone testified was that he did to the best of his ability but saw that he was being pulled in one direction at one time in total compliance with the instruction to get Spread Eagle. In that respect, the Ling v. Banda case is very important because there's, and as the district court correctly noted, it's hard to believe that a suspect could conceivably lie Spread Eagle on the ground while a dog is viciously attacking him. The question is not necessarily did the suspect comply but whether or not the use of force was reasonable in response to the actions of the suspect. Here, I think Malone's efforts to comply and the fact that any reasonable officer who's looking at someone attempting lying on the ground helpless with a dog on him and officers surrounding him would find that the use of force in that circumstance was unreasonable. I see that my time is almost up, so unless the court has any further questions, we would ask that the court dismiss this appeal for lack of jurisdiction because fact issues remain for the trial court. Thank you, Your Honor. Mr. Thomas? Yes, Your Honor. You have five minutes on rebuttal. Your Honor. Please, the court. Your Honor. With regard to jurisdiction, Your Honor, Crenshaw v. Lister, 556 Fed 2nd, I'm sorry Fed 3rd, 1283 the 11th Circuit. The court found there that to the extent the decision turns on an issue of law, it is appealable. And where the court finds that a reasonable jury taking the facts in light most favorable to the plaintiff could have found that the defendant violated the defendant's clearly established, the plaintiff's clearly established right to be then the case is appealable since that is a direct question of law and a legal question for the court. Furthermore, the Supreme Court rejected the contention raised by the appellees that this court may not consider this appeal because summary judgment was denied and there the court's finding was that there were material issues and that finding bars an interlocutory review because the material issue question is a question of law and not a question of fact. So the court in determining that there were material issues and some of these material issues we have contended are not material issues and because the court found that a jury, a reasonable jury could find that there were material issues of fact then or could find based on these facts then there is jurisdiction on the case. The the I did not get to complete my argument and that's my fault but basically what what I would say in rebuttal to the appellee is this was a situation that was obviously rapidly evolving. It was a dangerous situation. If you view the video you will see that Officer Tidwell acted very competently in actually arresting a very dangerous felon who had committed a felony in his presence who was accused of committing two other felonies that day, stealing a car and burglarizing a garage who admitted to later that he was strung out on cocaine in an interview after the arrest and who further admitted that he was hoping the police officer would pull the trigger. This indicates a person who was not being cooperative in addition to the language he used to a police officer that he admits and furthermore he admitted that every single problem that occurred according to Tidwell actually occurred in his deposition under questioning by Mr. East. The question here is what would have been reasonable for him to assume that there was no weapon in that vehicle? Would have been reasonable for him to assume that there was no weapon on the person of Mr. Malone? When he got on the ground he was not in a position where he could see Tidwell could see his waistband. I see time is running out so I will close with this. The actions taken were reasonable under the circumstances and without the use of 20-20 hindsight and Officer Tidwell found himself in a situation due to the action of Mr. Malone who was pulling his hands into the car before he advanced upon the window of the pickup. I ask you to reverse this decision. Thank you.